# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 29, 2021

Lyle W. Cayce
Clerk

No. 20-40027

Manning Rollerson,

*Plaintiff—Appellant*,

*versus*

Brazos River Harbor Navigation District of Brazoria County Texas, *now known as* Port Freeport; United States Army Corps of Engineers,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 3:18-CV-235

Before Jones, Haynes, and Ho, *Circuit Judges*.

Haynes, *Circuit Judge*:

This case concerns claims under § 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06 involving racial claims by the Appellant. As explained below, we AFFIRM in part and REVERSE and REMAND in part.

No. 20-40027

## I.    Background

Manning Rollerson, who alleges discrimination in his brief based upon being African-American,[1] owns an interest in real property in the East End neighborhood of Freeport, Texas.  The neighborhood was created in the 1930s, when the Freeport city council designated the area as a "Negro reservation" and forced all African-American residents, apart from live-in servants, to relocate there.  Today, the East End remains majority-minority: of its 365 residents in 2010, 71% were Hispanic and 15% African-American.  The City of Freeport as a whole is 60% Hispanic and 12% African-American.

Port Freeport (the "Port") is a navigation district governed by six locally-elected commissioners.  During the past ten years, the Port has been cooperating with the U.S. Army Corps of Engineers (the "Corps") on planning and executing the Freeport Harbor Channel Improvement Project.  The channel improvement project will deepen several areas of Freeport harbor, including the area alongside Berth 7 of the Velasco Container Terminal.  The Velasco Terminal is adjacent to the East End.

To complement the channel improvement project, the Port plans to expand its facilities at and around the Velasco Terminal.  To construct these new facilities, the Port needs land, and has consequently been acquiring properties in the East End with the goal of eventually buying up the entire neighborhood. Indeed, by March 2019, the Port owned 393 out of 581 platted lots in the East End.  To fund these acquisitions and other aspects of its expansion, the Port has allegedly applied for and received federal funding, including over $48 million from the Corps.

---

[1]  Rollerson failed to make this explicit allegation in his complaint.  We agree that the district court should have allowed him to amend his complaint to assert his race.

No. 20-40027

Rollerson asserted that the Port has used coercive means to obtain property in the East End.  For example, he alleged that the Port has threatened East End property-owners with condemnation and eminent domain; that Port officials have told residents that there are liens on their property, even when there are not; and that the Port has refused to provide independent appraisals of properties when it makes an offer.  The Port has also allegedly been conspiring with city officials to deny building permits in the East End, keeping property values low.  Further, Rollerson claimed that the Port has demolished or defaced many of the properties it has acquired, depressing the values of the remaining unsold properties and putting more pressure on their owners to sell.  Rollerson alleged that communications between the Port and its broker indicated that the East End property the Port has been acquiring would be worth "15–20 times more on the open market" than what the Port offered.[2]

On November 1, 2017, Rollerson and other East End residents submitted an administrative complaint to various federal agencies, including the U.S. Department of Defense (the "DOD"), asserting that the Port's actions in the East End violate Title VI.  By October 2018, all the agencies except for the DOD had responded, deferring jurisdiction to the DOD.  On February 13, 2019, the Corps, an agency within the DOD, denied the administrative complaint by letter, stating:

> The U.S. Army Corps of Engineers takes its responsibilities under Title VI very seriously.  However, the subject East End displacements are not part of any [Corps] project, and the

---

[2]  Rollerson also contended that the Port hired a local contractor in 2016 to build residential housing so that it could "swap houses" with East End residents but that these were not fair swaps.  He included this allegation as part of his questioning of the Port Commission's motivations and integrity.

navigation program activities at Freeport Harbor do not constitute "Federal financial assistance" as that term is used in Title VI of the Civil Rights Act. Accordingly, we do not have Title VI jurisdiction and do not intend to take further action on the administrative complaint.

Following the denial of the administrative complaint, Rollerson sued the Port and the Corps in federal district court. Rollerson claimed that the Port violated § 601 of Title VI by intentionally discriminating against East End residents during its expansion and that the Corps violated the APA by denying his administrative complaint. On recommendation from the magistrate judge, the district court granted the Port's motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). On a separate recommendation from the magistrate judge, the district court also granted the Corps's motion to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). Rollerson timely appealed. *See* 28 U.S.C. § 2107(b).

## II.    Jurisdiction & Standard of Review

The district court had jurisdiction under 28 U.S.C. § 1331. This court has jurisdiction over Rollerson's appeal under 28 U.S.C. § 1291. We review de novo a district court's dismissal of a complaint under Rule 12(b)(6). *Ruiz v. Brennan*, 851 F.3d 464, 468 (5th Cir. 2017). To survive dismissal under Rule 12(b)(6), a complaint's allegations must, "when taken as true, state[] 'a claim to relief that is plausible on its face.'" *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 726 (5th Cir. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Dismissal for lack of subject-matter jurisdiction under Rule 12(b)(1) is also reviewed de novo. *Raj v. La. State Univ.*, 714 F.3d 322, 327 (5th Cir. 2013). If, as here, the district court relied only on the face of the complaint, our review is "limited to determining whether the district court's application

No. 20-40027

of the law is correct." *Rodriguez v. Christus Spohn Health Sys. Corp.*, 628 F.3d 731, 734 (5th Cir. 2010) (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)). Further, a Rule 12(b)(1) motion "should be granted only if it appears certain the plaintiff cannot prove any set of facts that would entitle her to recovery." *Morris v. Thompson*, 852 F.3d 416, 419 (5th Cir. 2017).

## III. Discussion

Rollerson appeals the district court's dismissal of his § 601 claim against the Port and his APA claim against the Corps. We conclude that the district court properly dismissed Rollerson's § 601 claim, but that it erred in dismissing his APA claim.

### A. § 601

Rollerson sought to challenge the Port's expansion into the East End under § 601 of Title VI, which provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Only racial discrimination of the same character as that forbidden by the Equal Protection Clause is prohibited by § 601. *Grutter v. Bollinger*, 539 U.S. 306, 343 (2003). Thus, it "prohibits only intentional discrimination." *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001). As the Port fails to contest that Rollerson has adequately alleged federal funding for present purposes,[3] the issue on appeal is whether Rollerson's operative complaint adequately alleged intentional discrimination.

---

[3] Rather, the Port asserts that it does not receive any federal funding based on documents attached in the Corps's motion to dismiss. It claims that we may examine documents beyond the pleadings when reviewing a claim under the Rule 12(b)(6) standard if "they are referred to in plaintiff's complaint and are central to her claim." *Collins v.*

No. 20-40027

To plead that the Port acted with discriminatory intent, Rollerson must allege that the Port is expanding into the East End "at least in part 'because of,' not merely 'in spite of,' [the expansion's] adverse effects" on the East End's minority population. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). The Supreme Court laid out one method of proving such intent in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–68 (1977). Under *Arlington Heights*, the "starting point" of the inquiry is whether the challenged action "bears more heavily on one race than another." *Id.* at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). If the disparate impact is clearly "unexplainable on grounds other than race," then a court may infer racial animus. *Arlington Heights*, 429 U.S. at 266. If not, the court must perform "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.*

The Supreme Court has provided five factors to guide this inquiry: "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016) (en banc) (plurality opinion) (quoting *Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989)). These factors are not exhaustive, and the ultimate determination requires examining "the totality of the circumstances." *Veasey*, 830 F.3d at 230, 235 (plurality opinion).

---

*Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000). However, Rollerson did not refer to those documents in his complaint, so this exception does not apply.

Assuming arguendo that Rollerson may rely on the *Arlington Heights* factors,[4] the critical problem for Rollerson is that the "sequence of events" leading to the Port's decision shows no sign of racial animus. As previously discussed, the channel improvement project, overseen by the federal government, is improving the harbor area around the Velasco Terminal. As part of this improvement, the Port is expanding the Velasco Terminal's facilities. Because the East End is adjacent to the Velasco Terminal, the Port must acquire land in the East End to expand. Thus, as Rollerson seems to admit, the Port's expansion in the East End has a legitimate motivation.

Despite recognizing the Port's legitimate motive, Rollerson could arguably succeed if he alleged facts supporting the contention that racial discrimination played some supporting role in the Port's decision-making. *See Arlington Heights*, 429 U.S. at 265 (explaining that a plaintiff need not show that the defendant was "motivated solely by" animus). Yet, Rollerson's complaint lacked any such allegations. On appeal, he tries to shoehorn miscellaneous allegations of wrongdoing by the Port into the categories of inquiry articulated in *Arlington Heights*, without demonstrating that the Port's misdeeds are linked to discriminatory intent.

---

[4] We have repeatedly held that an equal protection plaintiff "must allege and prove that he received treatment different from that received by similarly situated individuals." *Crain v. City of Selma*, 952 F.3d 634, 642 (5th Cir. 2020) (quoting *Priester v. Lowndes Cnty.*, 354 F.3d 414, 424 (5th Cir. 2004) (quoting *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001))). *But see Lewis v. Ascension Parish Sch. Bd.*, 806 F.3d 344, 359 n.19 (5th Cir. 2015) (noting that "there is uncertainty in the law regarding the circumstances under which an equal protection plaintiff alleging racial discrimination is required to identify a similarly situated comparator group and the showing required to discharge this burden"). In this case, Rollerson did not clearly identify any similarly situated individuals who have been treated differently by the Port; rather, he argues that plaintiffs relying on the *Arlington Heights* framework are not required to allege the existence of a similarly situated comparator. Because Rollerson's allegations did not give rise to an inference of intentional discrimination under *Arlington Heights*, we need not resolve this issue in this case.

Rollerson's main argument is that the Port significantly departed from the "normal procedural sequence" for acquiring land by failing to comply with the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (the "Relocation Act"), 42 U.S.C. §§ 4601–55, and Texas's eminent domain laws.  But even assuming that Rollerson has adequately alleged violations of the Relocation Act and Texas law, procedural violations do not demonstrate invidious intent of their own accord.  Rather, they must have occurred in a context that suggests the decision-makers were willing to deviate from established procedures in order to accomplish a discriminatory goal.  *See Veasey*, 830 F.3d at 237–38, 239, 241 (explaining that the "extraordinary degree of procedural irregularities" during the passage of a voter identification law supported a finding of discriminatory intent because these irregularities "occurred . . . as minority populations rapidly increased" and the problem the statute purported to address—in-person voter fraud— was "almost nonexistent"); *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 227–29 (4th Cir. 2016) (holding that the North Carolina legislature's "rush[]" to enact election laws in the immediate aftermath of the Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), indicated that the legislature acted with invidious intent, as, prior to *Shelby County*, those laws likely would not have survived preclearance by the Department of Justice).

The Port makes several arguments, but the one that is crucial here is that unlike in *Veasey* or *McCrory*, Rollerson failed to tie the Port's actions to any specific event or circumstance that is indicative of discriminatory intent. Instead, he relied on Freeport's history of racial segregation.  But "the most relevant 'historical' evidence is relatively recent history, not long-past history."  *Veasey*, 830 F.3d at 232 (plurality opinion).  The only recent occurrence Rollerson pointed to is Freeport's policy of not approving any building permits in the East End, allegedly implemented to facilitate the

Port's expansion by keeping property values low.  Yet this policy is insufficient to demonstrate discriminatory intent, as there are plenty of non-invidious reasons for Freeport to aid the Port—for example, Freeport may believe that the expansion will generate economic growth that will ultimately benefit the city as a whole.  Because Rollerson made no allegations that tend to exclude these benign purposes, he failed to sufficiently allege that the Port is acting with discriminatory intent.  Thus, the district court properly dismissed Rollerson's § 601 claim.

### B.    APA

Rollerson sought judicial review under the APA over the Corps's decision to deny his administrative complaint.  Although the APA broadly offers judicial review to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," 5 U.S.C. § 702, there are some important limits.  Two are relevant here.  First, a plaintiff cannot bring suit under the APA if he has another "adequate remedy in a court." *Id.* § 704.  Second, agency action is unreviewable if it "is committed to agency discretion by law." *Id.* § 701(a)(2).

The district court found that Rollerson's Title VI claim against the Port was an adequate remedy, and it thus concluded that it lacked subject-matter jurisdiction over Rollerson's claim against the Corps.  In the alternative, the Corps argues that the district court's dismissal may be affirmed because the Corps's denial of Rollerson's administrative complaint was committed to its discretion.

### 1.    Adequate Remedy

The "adequate remedy" provision of § 704 is intended "simply to avoid duplicating previously established special statutory procedures for review of agency actions." *Darby v. Cisneros*, 509 U.S. 137, 146 (1993) (citing *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988)).  It is an "exception" that

should "not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action." *Bowen*, 487 U.S. at 903; *Darby*, 509 U.S. at 147 (explaining that courts must not "transform [§ 704] from a provision designed to 'remove obstacles to judicial review of agency action' . . . into a trap for unwary litigants" (citation omitted) (quoting *Bowen*, 487 U.S. at 904)). Although an alternative remedy "need not provide an identical review that the APA would provide," it must "offer[] the 'same genre' of relief." *Hinojosa v. Horn*, 896 F.3d 305, 310 (5th Cir. 2018) (per curiam) (quoting *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just. (CREW)*, 846 F.3d 1235, 1245 (D.C. Cir. 2017)), *cert. denied*, 139 S. Ct. 1319 (2019). At the same time, APA review is not precluded "if the very existence of an alternative remedy is 'doubtful.'" *CREW*, 846 F.3d at 1244 (D.C. Cir. 2017) (quoting *Bowen*, 487 U.S. at 905). Ultimately, the exception will apply only if there is "'clear and convincing' evidence of 'legislative intent' to create a special, alternative remedy and thereby bar APA review." *CREW*, 846 F.3d at 1245 (quoting *Garcia v. Vilsack*, 563 F.3d 519, 523 (D.C. Cir. 2009)).

Importantly, the question of whether a remedy is "adequate" under § 704 is distinct from the question of whether that remedy presents the plaintiff with a viable path to relief. *See Martinez v. Pompeo*, 977 F.3d 457, 460 (5th Cir. 2020) (per curiam) ("We agree with our sister circuits' uniform conclusion that '[a] legal remedy is not inadequate for purposes of the APA because it is procedurally inconvenient for a given plaintiff, or because plaintiffs have inadvertently deprived themselves of the opportunity to pursue that remedy.'" (alteration in original) (quoting *Town of Sanford v. United States*, 140 F.3d 20, 23 (1st Cir. 1998))); *CREW*, 846 F.3d at 1246 (noting that a court's "conclusion that certain relief is *available* under [a statute besides the APA] says nothing about its propriety in an individual

case"). Thus, Rollerson's failure to prevail on his § 601 claim does not affect the question of whether the APA provides relief.

The D.C. Circuit and the Fourth Circuit have interpreted § 704 to preclude APA review of an agency's failure to conduct its own Title VI enforcement action against an allegedly discriminating recipient of federal funds because § 601 provides a private right of action against the recipient itself. *See Women's Equity Action League v. Cavazos* (*WEAL*), 906 F.2d 742, 751 (D.C. Cir. 1990) (explaining that although "[s]uits directly against the discriminating entities may be more arduous, and less effective" than judicial oversight of agency action, "situation-specific litigation affords an adequate, even if imperfect, remedy"); *Wash. Legal Found. v. Alexander* (*WLA*), 984 F.2d 483, 486 (D.C. Cir. 1993) (holding that the availability of a private Title VI suit precluded APA review of an agency's decision not to enforce Title VI); *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 191–92 (4th Cir. 1999) (explaining that a "direct remedy against funding recipients is not only 'adequate,' but . . . is preferable to a direct suit against the agency itself"). As discussed above, Rollerson was able to seek redress from the Port directly under § 601. Nevertheless, Rollerson argues that these cases are inapposite in light of the Supreme Court's more recent decision in *Sandoval*.

Because *Sandoval* itself makes no mention of § 704 of the APA, some background is necessary to understand Rollerson's argument: § 602 of Title VI, 42 U.S.C. § 2000d-1, authorizes federal agencies to promulgate regulations "to effectuate the provisions of section [601]." In *Lau v. Nichols*, the Supreme Court interpreted such regulations as prohibiting discrimination "even though no purposeful design is present," meaning that they permit so-called "disparate-impact" claims. 414 U.S. 563, 568 (1974), *abrogation recognized by Sandoval*, 532 U.S. 275. However, in *Guardians Ass'n v. Civil Service Commission of City of New York*, a majority of the Court

reached the conclusion "that a violation [of § 601] itself requires proof of discriminatory intent." 463 U.S. 582, 608 n.1 (1983) (Powell, J. concurring) (analyzing the votes).  Four members of the Court went further, suggesting that the Court's conclusion about § 601 required abrogating *Lau*.  *Id.* at 611 (Powell, J., concurring in the judgment, joined by Burger, C.J., and Rehnquist, J.); *id.* at 615 (O'Connor, J., concurring in the judgment).  Nevertheless, in *Alexander v. Choate*, the Court restated that "actions having an unjustifiable disparate impact on minorities could be redressed through agency regulations designed to implement the purposes of Title VI."  469 U.S. 287, 293–94 (1985) (explaining that "Title VI had delegated to the agencies in the first instance the complex determination of what sorts of disparate impacts upon minorities . . . warrant altering the practices of the federal grantees that had produced those impacts").

*Sandoval* built on *Guardians* and *Choate* to clearly define the scope of Title VI's private right of action.  In *Sandoval*, the sole question presented was "whether private individuals may sue to enforce disparate-impact regulations promulgated under [§ 602]."[5]  532 U.S. at 278.  Although the Court decisively held "that no such right of action exists," *id.* at 293, it expressly reserved the question of whether "§ 602 confers the authority to promulgate disparate-impact regulations," *id.* at 286.  Thus, *Sandoval* eliminated the possibility of private disparate-impact claims but left untouched *Choate*'s apparent approval of the promulgation and enforcement of disparate-impact regulations by federal agencies.

---

[5] Prior to the Supreme Court's decision in *Sandoval*, at least nine courts of appeals had indicated that private plaintiffs could sue to enforce disparate-impact regulations promulgated under § 602.  *See Sandoval v. Hagan*, 197 F.3d 484, 503–04 (11th Cir. 1999), *rev'd*, 532 U.S. at 293.

No. 20-40027

Since the DOD has promulgated regulations under § 602, 32 C.F.R. §§ 195.1–14, the Corps has the capability to take action against any disparate-impact discrimination by the Port, despite the dismissal of Rollerson's intentional discrimination claim.[6] As to whether Rollerson can seek judicial review of the Corps's exercise of this power, he argues that *WEAL*, *WLA*, and *Jersey Heights* are no obstacle because they were decided before *Sandoval*, and therefore did not consider the possibility that there are types of discrimination that can be halted only by agencies in § 602 enforcement actions. Effectively, his contention is that § 601's private right of action for intentional discrimination cannot be considered an adequate remedy under § 704 of the APA for acts of disparate-impact discrimination that are only redressable by agency action under § 602.

The D.C. Circuit considered a similar argument in *National Wrestling Coaches Ass'n v. Department of Education*, 366 F.3d 930 (D.C. Cir. 2004), *abrogated on other grounds by Trudeau v. FTC*, 456 F.3d 178, 187–89 (D.C. Cir. 2006), *as recognized in Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620–21 (D.C. Cir. 2017). In that case, the plaintiffs sought APA review of a Department of Education Title IX policy interpretation that they asserted required funding recipients to engage in intentional discrimination in violation of Title IX. *Wrestling Coaches*, 366 F.3d at 935–36. The D.C. Circuit held that the plaintiffs' claims were barred by § 704 because they had the adequate alternative remedy of suing the funding recipients directly under

---

[6] In *Sandoval*, the Supreme Court questioned whether Title VI authorizes disparate-impact regulations, *see* 532 U.S. at 286 n.6, and there is a reasonable argument that *Choate*'s approval of such regulations was mere dictum, rather than a binding ruling, *but see United States v. Becton*, 632 F.2d 1294, 1296 n.3 (5th Cir. 1980) (explaining that "[w]e are not bound by dicta, even of our own court," but that "[d]icta of the Supreme Court are, of course, another matter"). Because neither party in this case has raised the issue, we assume arguendo that the DOD's disparate-impact regulations are valid.

Title IX. *Id.* at 945. In doing so, the *Wrestling Coaches* court rejected the plaintiffs' argument that the Supreme Court's decision in *Sandoval* rendered their private right of action inadequate. *Id.* at 946. Because the plaintiffs sought to enforce only Title IX's prohibition on intentional discrimination, rather than a disparate-impact regulation, and such a private cause of action remained viable post-*Sandoval*, the court held that the plaintiffs still had an adequate remedy under § 601, barring APA review. *Id.* Because *Sandoval* held that there is no private right of action to enforce disparate-impact regulations, the logic of *Wrestling Coaches* indicates that plaintiffs who seek to enforce disparate-impact regulations have no adequate alternative remedy to APA review.

Further, *WEAL*, *WLA*, and *Jersey Heights* were all based on the assumption that "Congress considered private suits to end discrimination . . . the proper means . . . to enforce Title VI." *WEAL*, 906 F.2d at 751; *WLA*, 984 F.2d at 486 (holding the same); *Jersey Heights*, 174 F.3d at 191–92 (holding the same). But the bottom line holding of *Sandoval* is that Congress intended private suits to challenge only intentional discrimination. *See* 532 U.S. at 293. If Congress did not intend for private suits to challenge disparate-impact discrimination, then it is difficult to see how it intended for private suits to serve as an alternative remedy to APA review for disparate-impact discrimination. *Cf. CREW*, 846 F.3d at 1245 (holding that the plaintiff had an adequate alternative remedy because circuit precedent established that private plaintiffs were entitled to enforce the relevant statutory provision under a federal statute).

In sum, the purpose of § 704 is to avoid duplicating existing avenues of review. *Darby*, 509 U.S. at 146. Apart from the APA, a private plaintiff has no means of securing review of whether a funding recipient is violating disparate-impact regulations. Therefore, the district court erred by

No. 20-40027

concluding that Rollerson's § 601 claim against the Port was an adequate alternative to his APA claim against the Corps.

## 2.    Committed to Agency Discretion

Regardless of § 704's inapplicability, we may still affirm if the Corps is correct that its denial of Rollerson's administrative complaint was committed to its discretion under § 701(a)(2). *In re Am. Hous. Found.*, 785 F.3d 143, 153 (5th Cir. 2015) (noting that we may affirm the dismissal of a complaint "on any basis supported by the record" (quoting *Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir. 1998))). The exception to judicial review for agency action committed to agency discretion is "'very narrow' and applies only 'in those rare instances where "statutes are drawn in such broad terms that in a given case there is no law to apply."'" *Ellison v. Connor*, 153 F.3d 247, 251 (5th Cir. 1998) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)). Under this standard, "an agency's decision not to prosecute or enforce . . . is a decision generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). The Corps argues that because Rollerson sought review of its decision not to enforce its Title VI regulations against the Port, *Heckler*'s "general presumption of unreviewability of decisions not to enforce" applies to bar Rollerson's claim. *Id.* at 834.

In contrast, Rollerson characterizes his APA claim as seeking review of only the Corps's decision to deny his administrative complaint. Further, because the Corps denied his administrative complaint on the grounds that it lacked jurisdiction, Rollerson maintains that an exception to *Heckler*'s general rule applies.

In *Heckler*, the Supreme Court noted that "a refusal by the agency to institute proceedings based solely on the belief that it lacks jurisdiction" may

15

not be committed to agency discretion.  470 U.S. at 833 n.4.  The Ninth and
D.C. Circuits have affirmatively held that the presumption that an agency's
refusal to enforce is unreviewable "may be overcome if the refusal is based
solely upon the erroneous belief that the agency lacks jurisdiction."  *Mont.
Air Chapter No. 29, Ass'n of Civilian Technicians, Inc. v. Fed. Lab. Rels. Auth.*,
898 F.2d 753, 754 (9th Cir. 1990); *accord Balt. Gas & Elec. Co. v. FERC*, 252
F.3d 456, 460 (D.C. Cir. 2001).

*Heckler*'s primary concern was that permitting APA review of
decisions not to enforce would allow courts to second-guess agencies'
allocation of their scarce resources.  470 U.S. at 831–32 (noting that "[t]he
agency is far better equipped than the courts to deal with the many variables
involved in the proper ordering of its priorities").  The rule adopted by the
Ninth and D.C. Circuits accommodates this concern, as it does not broadly
empower plaintiffs to force agencies to take enforcement actions.  *See Fla.
Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (explaining that "[i]f
the record before the agency does not support the agency action . . . the
proper course, except in rare circumstances, is to remand to the agency").
Rather, the rule requires only that the agency state that it is declining to take
enforcement action for a non-jurisdictional reason.  Such a statement need
not be lengthy.  *See, e.g., Citizens for Resp. & Ethics in Wash. v. FEC*, 993 F.3d
880, 882, 883 (D.C. Cir. 2021) (determining that the agency's decision not
to enforce was unreviewable where the agency, explicitly invoking its
prosecutorial discretion, had explained that "proceeding further would not
be an appropriate use of [its] resources" (quotation omitted)).

Further, *Heckler*'s overarching point was that, in the usual case, a
court will lack legal standards to judge the validity of a decision not to enforce
because such decisions are so intertwined with policy considerations.
470 U.S. at 830–31 (emphasizing that the Court's holding was an outgrowth
of the "no law to apply" standard).  But if an agency's decision is justified

solely on a supposed jurisdictional barrier, then there is law to apply, bringing the decision within the ambit of APA review.

Here, when denying Rollerson's administrative complaint, the Corps did not invoke reasoning that is intertwined with a policy decision (such as limited resources). Instead, the Corps justified its decision solely on the basis that it lacked jurisdiction to investigate potential Title VI violations by the Port because the Corps was not funding the Port's expansion project. Accordingly, review of the Corps's action is limited to that basis, which, if true, is a legal barrier, not a policy decision. *See Michigan v. EPA*, 576 U.S. 743, 758 (2015) (noting the "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action"). Thus, the legal standard is clear—if the Corps provided the Port with "[f]ederal financial assistance," the Corps's decision as to its jurisdiction was incorrect. 42 U.S.C. § 2000d. Whether the Corps actually funds the Port is a pure fact question of the sort that courts are well equipped to adjudicate and will not require any second-guessing of the Corps's policy decisions.

The Corps offers no reason to think otherwise. Instead, the Corps argues that because Rollerson requested forms of relief beyond remand to the agency, the jurisdiction-denial exception to the *Heckler* presumption should not apply. But Rollerson explicitly framed his APA claim as a challenge to the Corps's denial of his administrative complaint; the fact that he requested relief to which he is not entitled does not somehow prevent the award of relief to which he is entitled.[7] *See* FED. R. CIV. P. 54(c) (stating that "final

---

[7] The Corps suggests that relief is foreclosed by our decision in *Sierra Club v. Peterson*, 228 F.3d 559 (5th Cir. 2000) (en banc). In that case, we held that the plaintiff environmental groups had launched a "programmatic challenge" to the U.S. Forest Service's "practices throughout the four National Forests in Texas and covering harvesting from the 1970s to timber sales which [had] not yet occurred," which was

No. 20-40027

judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings").

Consequently, the Corps's decision to deny Rollerson's administrative complaint was not committed to its discretion and is thus reviewable under the APA.[8] On remand, the district court should consider only the issue of whether the Corps correctly denied Rollerson's administrative complaint on the basis that it lacked jurisdiction due to an absence of federal financial assistance within the meaning of Title VI.

---

impermissible because the APA only permits review of "specific and final agency action." *Id.* at 565–66. Although the environmental groups identified "some specific [timber] sales in their pleadings that they argue[d] [were] final agency actions," we concluded that they could not "challenge an entire program by simply identifying specific allegedly-improper final agency actions within that program." *Id.* at 567.

Unlike the environmental groups in *Peterson*, Rollerson does not seek review of the Corps's "day-to-day operations." *Id.* at 566 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990)). Rather, he seeks review only of the Corps's decision to deny his administrative complaint. The fact that the results of this review may have consequences for how the Corps handles future administrative complaints does not preclude review, as a challenge to discrete agency action is permissible "even when such a challenge has 'the effect of requiring . . . a whole "program" to be revised by the agency.'" *Peterson*, 228 F.3d at 567 (quoting *Lujan*, 497 U.S. at 894). Thus, Rollerson is not bringing an impermissible "programmatic challenge" of the sort forbidden by *Peterson*.

[8] Under § 603 of Title VI, 42 U.S.C. § 2000d-2, an agency's decision to withhold or terminate federal funding due to violations of Title VI "shall not be deemed committed to unreviewable agency discretion within the meaning of [§ 701(a)(2)]." One could argue that Congress's decision to expressly permit review of agency decisions to terminate funding under Title VI means that Congress implicitly intended decisions not to enforce Title VI to be unreviewable. However, "[a]s a general matter, '[t]he mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others.'" *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 674 (1986) (second alteration in original) (quoting *Abbot Lab'ys v. Gardner*, 387 U.S. 136, 141 (1967), *abrogated on other grounds by Califano*, 430 U.S. at 105). Thus, § 603 does not counsel against permitting APA review in this case.

No. 20-40027

## IV.    Conclusion

We AFFIRM the district court's dismissal of Rollerson's § 601 claim against the Port.  However, we REVERSE the district court's dismissal of Rollerson's APA claim against the Corps, and we REMAND for further proceedings consistent with this opinion.

EDITH H. JONES, *Circuit Judge,* concurring in the judgment:

I respectfully concur in the judgment insofar as it upholds the dismissal of the plaintiff's intentional discrimination claim under § 601 and remands solely for a determination whether the navigation program activities associated with the Corps' Freeport Harbor Channel Improvement Project constitute "Federal financial assistance" as that term is used in Title VI of the Civil Rights Act. Because the weight of authority would consider this fact, predicate to courts having jurisdiction over an APA action against the Corps, to be judicially reviewable, the district court should decide it. Even if the district court decides that the project invoked Title VI, however, the Corps then bears a minimal burden to explain if it chooses to exercise discretion not to pursue some kind of racial disparate impact claim against the Port.

Aside from this point of agreement, I would find Rollerson's theory of intentional discrimination wholly wanting on its face. Therefore, I disagree with analyzing his claim under the *Village of Arlington Heights* factors. To begin with, his case arises from the decision of the Port of Freeport, an entity governed by elected officials, to expand its commercial activity at the Velasco Terminal by acquiring property in Freeport's East End "adjacent to" the terminal. The harbor channel's location is fixed. Any expansion of the channel must be along or within that fixed course. The Velasco Terminal's location is fixed. Therefore, unless there is real estate other than the East End into which the terminal could expand, it is impossible to attribute "intentional discrimination" to the choice of where to expand. There is no suggestion in plaintiff's complaint of any other possible area in which the Velasco Terminal could have expanded. Geography, not discrimination of any kind, lies behind the Port's decision about location.

Even if a cause of action based on "environmental justice" exists in the law (a dubious claim not presented to us in this appeal), it would not exist here. Theories of "environmental justice" must presuppose that public

bodies have alternatives to locating public works projects in economically disadvantaged neighborhoods. Where there are no alternatives, there is no choice, and there can be no "injustice" in making the sole available choice. *Cf. Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 540–45, 135 S. Ct. 2507, 2522–25 (2015) (indicating stringent parameters under the Fair Housing Act and similar statutes for recognizing disparate impact claims). For my own part, I think Justice Thomas has the better of the argument that statutes prohibiting on their face intentional discrimination should not be extended by judicial or administrative fiat to encompass disparate impact theories. *See id.* at 550–55, 135 S. Ct. at 2528–29 (Thomas, J., dissenting).

No. 20-40027

JAMES C. HO, *Circuit Judge*, concurring in part and concurring in the judgment:

I concur in the judgment and in all but Section III.A of Judge Haynes's opinion. With respect to the intentional discrimination claim, we all agree that this case turns on geography, not race. With respect to the disparate impact claim, we all agree that remand is appropriate. I write separately to explain why I share Judge Jones's concerns about unelected agency officials usurping Congress's authority when it comes to disparate impact theory.

\* \* \*

Congress enacted Title VI of the Civil Rights Act of 1964 to prohibit intentional racial discrimination—not to restrict neutral policies untainted by racial intent that happen to lead to racially disproportionate outcomes. *See* 42 U.S.C. § 2000d; *Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001) ("[§ 2000d] prohibits only intentional discrimination," not "activities that have a disparate impact on racial groups").

There's a big difference between prohibiting racial discrimination and endorsing disparate impact theory. *See*, *e.g.*, WILLIAM N. ESKRIDGE, JR., DYNAMIC STATUTORY INTERPRETATION 78 (1994) (disparate impact is "a significant leap away from" intentional racial discrimination). It's the difference between securing equality of opportunity regardless of race and guaranteeing equality of outcome based on race. It's the difference between color blindness and critical race theory. *Compare* Martin Luther King, Jr., I Have A Dream: Address to the March on Washington for Jobs and Freedom (Aug. 28, 1963) ("I have a dream that my four little children will one day live in a nation where they will not be judged by the color of their skin but by the content of their character."), *with* IBRAM X. KENDI, HOW TO BE AN ANTI-RACIST 18 (2019) ("A racist policy is any measure that produces or sustains racial inequity between racial groups."); *see also 'When*

*I See Racial Disparities, I See Racism.' Discussing Race, Gender and Mobility*, N.Y. TIMES (Mar. 27, 2018), *available at* https://www.nytimes.com/interactive/2018/03/27/upshot/reader-questions-about-race-gender-and-mobility.html?smid=tw-share.

Prohibiting racial discrimination means we must be blind to race. Disparate impact theory requires the opposite: It forces us to look at race—to check for racial imbalance and then decide what steps must be taken to advance some people at the expense of others based on their race.

But racial balancing is, of course, "patently unconstitutional." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 723 (2007). Accordingly, "serious constitutional questions . . . might arise" if "[disparate impact] liability were imposed based solely on a showing of a statistical disparity." *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 540 (2015). *See also Ricci v. DeStefano*, 557 U.S. 557, 594–96 (2009) (Scalia, J., concurring) (same).

So disparate impact theory must be justified, if at all, as nothing more than a legal presumption that evidence of racial imbalance is evidence of racial discrimination—at least until the defendant can prove otherwise. As in any area of the law, evidence of guilt can be hard to come by. Requiring evidence of discrimination can therefore result in underenforcement. And so its proponents point out that disparate impact theory can help "uncover[] discriminatory intent" and "counteract unconscious prejudices and disguised animus" or "covert and illicit stereotyping" that "escape easy classification as disparate treatment." *Inclusive Cmtys.*, 576 U.S. at 540. Think of it as "an evidentiary tool . . . to identify genuine, intentional discrimination—to 'smoke out[]' . . . disparate treatment." *Ricci*, 557 U.S. at 595 (Scalia, J., concurring).

No. 20-40027

But a presumption of discrimination runs into a bedrock principle of our legal system. We ordinarily assume innocence, not bigotry. Plaintiffs must typically prove, not presume, discrimination. "We should not automatically presume that any institution with a neutral practice that happens to produce a racial disparity is guilty of discrimination until proved innocent." *Inclusive Cmtys.*, 576 U.S. at 554 (Thomas, J., dissenting).

Moreover, opponents of disparate impact theory worry that it will only exacerbate, rather than alleviate, racial tension—by pressuring defendants to adopt policy changes for the explicit purpose of taking from some and giving to others based on their race. They fear that disparate impact theory means not only presuming discrimination, but requiring it. *See*, *e.g.*, *Ricci*, 557 U.S. at 594 (Scalia, J., concurring) ("disparate-impact provisions place a racial thumb on the scales, often requiring employers to evaluate the racial outcomes of their policies, and to make decisions based on (because of) those racial outcomes").

A former Justice Department official offered the following illustration of this concern: "If a bigoted Los Angeles employer determined that he had been hiring 'too many' Asians and Jews by giving a particular test, and therefore deliberately discarded the test for one that he knows will result in fewer of them being hired, all would agree that this violates the law. And yet, it is precisely this kind of calculation that disparate-impact theory applauds." Roger Clegg, *The bad law of "disparate impact"*, THE PUBLIC INTEREST, Winter 2000, at 87-88.

The illustration turned out to be prescient: The Supreme Court confronted that very fact pattern a few years later in *Ricci*. The Court there noted that "[a]ll the evidence demonstrate[d] that the City chose not to certify the examination results *because of the statistical disparity based on race*." 557 U.S. at 579 (emphasis added). "[T]he City rejected the test results

24

because 'too many whites and not enough minorities would be promoted were the lists to be certified.'" *Id.* (quoting district court opinion). And the city candidly admitted that it did so "to avoid disparate-impact liability." *Id.* at 580.

The Court made two observations about the city's conduct that are no doubt troubling to disparate impact opponents. First, the city's decision to set aside the exam results out of fear of disparate impact liability resulted in racial discrimination against those who succeeded on the exam—precisely as Clegg predicted. Second, this racial discrimination would be perfectly *permissible* as a matter of disparate impact law, so long as there is a "strong basis in evidence" that it was necessary to avoid disparate impact liability. *See*, *e.g.*, *id.* at 585 ("We hold . . . that, under Title VII, before an employer can engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact, the employer must have a strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action.").

So these are not frivolous concerns of discrimination that we're talking about here. In fact, for disparate impact advocates, requiring discrimination may not be a problem—it may be the whole point. To quote one leading critical race theorist, "[t]he only remedy to past discrimination is present discrimination," and "[t]he only remedy to present discrimination is future discrimination." KENDI, *supra*, at 19.

To be sure, then, citizens can debate in good faith whether disparate impact theory is the right way to eliminate the scourge of racial bigotry from our Nation. To some, it is the cure. But to others, it is worse than the disease.

My point is simply this: If disparate impact theory is going to be incorporated into federal law, it should be done by Congress—not agency regulators. *See generally Inclusive Cmtys.*, 576 U.S. at 550–53 (Thomas, J.,

dissenting).  "[S]ubstantive federal law . . . must be created by Congress." *Sandoval*, 532 U.S. at 286.

\* \* \*

It's hard to imagine an area where we should be more wary of vesting discretion in public officials than race.  Our Nation's history is replete with tragic lessons in this regard.  *See*, *e.g.*, *Plessy v. Ferguson*, 163 U.S. 537 (1896), *overruled by Brown v. Board of Ed.*, 347 U.S. 483 (1954).  We have learned the hard way to distrust those who claim they're using race for benevolent, rather than nefarious, ends.  *See*, *e.g.*, *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 325 (2013) (Thomas, J., concurring) ("We grant that segregation may not be the ethical or political ideal.  At the same time we recognize that practical considerations may prevent realization of the ideal") (quoting Kansas Br. on Rearg. in *Brown v. Bd. of Educ.*, O.T. 1953, at 56); *id.* ("[I]t would be unwise in administrative practice . . . to mix the two races in the same schools at the present time") (quoting Appellees' Br. in *Briggs v. Elliott*, O.T. 1952, at 26-27); *id.* ("'[T]he *mores* of racial relationships are such as to rule out, for the present at least, any possibility of admitting white persons and Negroes to the same institutions'") (quoting Respondents' Br. in *Sweatt v. Painter*, O.T. 1949, at 96).

So public officials may sincerely believe that race-conscious policies are beneficial rather than corrosive.  But the American people have never been the blindly trusting sort.  Citizens may fairly wonder how officials can condemn race-neutral policies as racist and defend explicitly race-conscious programs as inclusive.  *Compare* Complaint, *United States v. Georgia*, 2021 WL 2629488, No. 1:21-cv-02575-JPB (N.D. Ga. June 25, 2021) (challenging Georgia Senate Bill 202 as racially discriminatory), *with* Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction, *Faust v. Vilsack*, No. 21-CV-548-WCG (E.D. Wis. June 18, 2021) (defending

exclusion of white farmers from the American Rescue Plan Act).  Citizens are understandably skeptical when government officials claim that they're just here to help—but then declare that up is down, left is right, race consciousness is good, and race neutrality is bad.

It's said that the road to hell is paved with good intentions.  That's why we have laws on the books, like Title VI, that simply forbid the "sordid business" of "divvying us up by race"—no matter what our intentions.  *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring in part, concurring in the judgment in part, and dissenting in part).  And that's why I agree with Judge Jones that, if we are to adopt disparate impact theory as a matter of national policy, it must be done by Congress—not "by judicial or administrative fiat."  *Ante*, at 21.

I concur in part and concur in the judgment.