# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 15, 2023

Lyle W. Cayce
Clerk

No. 23-20131

Craig Price, II,

*Plaintiff—Appellant*,

*versus*

Valvoline, L.L.C.,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:21-CV-3683

_____

Before Clement, Southwick, and Ho, *Circuit Judges*.

Edith Brown Clement:

Craig Price, II, claims that Valvoline, LLC terminated his employment on account of his race and subjected him to a hostile work environment at its La Porte, Texas plant. The district court granted summary judgment to Valvoline. Because we find that Price's employment was terminated due to his repeated absenteeism and that the allegedly race-motivated comments directed towards him were not objectively severe or pervasive enough to create a hostile work environment, we AFFIRM.

No. 23-20131

## I.

Price, a Black man, was employed as a loader/unloader at Valvoline's plant in La Porte, Texas. Valvoline maintained an attendance policy under which it assessed "points" for attendance-related issues. For example, employees who were late or left their shift early would be assessed a half point, and employees who missed their shift entirely without providing 24-hours' notice would be assessed a full point. Under this policy, Valvoline imposed progressive discipline once an employee obtained a certain number of points within a twelve-month period: five points would result in a verbal warning; six, a written warning; seven, a three-day suspension; and eight, termination. During the COVID-19 pandemic, Valvoline informed its employees that they should not come to work, and would not be issued attendance points, if they reported that they were experiencing COVID-19-related symptoms. But absences caused by non-COVID illnesses would still be assessed attendance points under the policy.

On December 30, 2019, Price was issued a verbal warning regarding his attendance and signed an acknowledgement that further attendance issues would "result in further disciplinary action, up to and including termination." On February 10, 2020, Price received a written warning regarding his attendance—the next level of discipline under the policy—and again signed an acknowledgement that further attendance issues would "result in further disciplinary action, up to and including termination." On May 4, 2020, Price was suspended for three days and issued a final written warning concerning his attendance issues. Price again signed an acknowledgement that further attendance issues would "result in further disciplinary action, up to and including termination." Finally, on October 26, 2020, Price called the plant manager to inform him that he would need to miss his shift that day due to food poisoning. Because this was a non-COVID illness and Price was absent without providing 24-hours' notice, he was

assessed a point under the attendance policy, and his employment was therefore terminated.[1]

Price filed a lawsuit against Valvoline under Title VII of the Civil Rights Act of 1964 on November 9, 2021, and amended his complaint on January 28, 2022. Price alleged that his race, not his violations of the attendance policy, was the real reason for his termination, and asserted claims of race discrimination, retaliation, and hostile work environment. In support of these claims, Price pointed to various allegedly discriminatory statements made by his supervisors. Specifically, Price claimed that supervisor Dalan Motz once said to him that "you people always want something for free" when Price asked Motz about an incentive bonus t-shirt that he was due to receive, and that assistant plant manager Jamie Langston called Price a "lazy boy" when he was unable to get a forklift to work.

Price later submitted a declaration from Jeffrey Brown, the only Black supervisor at Valvoline's La Porte plant, that claimed plant manager Frank Harris had repeatedly used the full N-word when telling Brown that the Black workers on the floor were using the epithet to refer to each other and asking him what should be done about it. Brown's declaration also alleged that Harris had told Brown that Valvoline "needed more diversity in the workplace"—a comment which Brown "understood as Mr. Harris wanting to reduce the number of African Americans working at the plant, given that the workforce [was] predominantly African American."

---

[1] Between his May 4 suspension and October 26 termination, Price was also disciplined for his on-the-job performance. On May 27, 2020, Price was issued a written warning for failure to follow instructions and failure to follow safety guidelines when he did not carry his radio, as required, and therefore missed a call to shelter-in-place during a tornado warning. And on June 2, 2020, Price received another three-day suspension and final written warning for wearing earbuds in the warehouse in violation of company policy and raising his voice to his supervisor.

No. 23-20131

The district court granted summary judgment to Valvoline. First, the court concluded that Price had not presented direct evidence of race-based discrimination, finding that the alleged comments by plant manager Harris were only "stray remarks." Second, the court held that Price had not presented circumstantial evidence of race-based discrimination either because he had not identified any similarly situated non-Black coworker who had been treated more favorably. Third, the court determined that Price had not established a hostile work environment claim because the comments by Motz and Langston were only "offensive utterance[s]." And fourth, the court found that Price's retaliation claim failed because he could not prove a causal link between any protected activity and his termination. Price only appeals the district court's judgment that he had not presented direct evidence of race-based discrimination and failed to establish a hostile work environment claim.

## II.

We review the district court's grant of summary judgment *de novo*, viewing all factual inferences in the light most favorable to Price. *Caldwell v. KHOU-TV*, 850 F.3d 237, 241 (5th Cir. 2017). We may affirm on any adequate ground supported by the record, even if it is different than the one on which the district court actually relied. *Montgomery v. Brookshire*, 34 F.3d 291, 297 (5th Cir. 1994). Summary judgment is appropriate "when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Davidson v. Fairchild Controls Corp.*, 882 F.3d 180, 184 (5th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)).

## III.

First, we address Price's race-discrimination claim. "In employment discrimination cases, a plaintiff may rely on direct or circumstantial evidence, or both." *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 377 (5th Cir.

2010). "A statement or document which shows 'on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action is direct evidence of discrimination.'" *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 579 (5th Cir. 2020) (alteration adopted) (quoting *Herster v. Bd. of Supervisors of La. State Univ.*, 887 F.3d 177, 185 (5th Cir. 2018)). Statements that do not meet this standard "without inference or presumption" are considered "only 'stray remarks.'" *Etienne v. Spanish Lake Truck & Casino Plaza, LLC*, 778 F.3d 473, 476 (5th Cir. 2015) (quotation marks and citation omitted). Price's appeal focuses almost exclusively on whether the district court properly determined that plant manager Harris's comments were "stray remarks" rather than direct evidence of discrimination. But we find it unnecessary to resolve this issue because, even if Price had presented direct evidence of racial discrimination, his discrimination claim would still fail.

Once a plaintiff presents direct evidence of race-based discrimination, "the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor." *Etienne*, 778 F.3d at 475 (quotation marks and citation omitted). Here, the evidence makes clear that Price was fired due to his repeated violations of Valvoline's attendance policy. Price concedes that he was aware of Valvoline's attendance policy, how the points system worked, and the progressive discipline imposed, characterizing it as "pretty straightforward." And we have repeatedly found that violation of a company's attendance policy is a valid, non-discriminatory reason for termination. *E.g.*, *Powers v. Woodlands Religious Cmty. Inc.*, 323 F. App'x 300, 302 (5th Cir. 2009); *Davis v. Moore Wallace, Inc.*, 217 F. App'x 313, 315–16 (5th Cir. 2007).

Price does not meaningfully contest the fact that he was terminated due to his absenteeism. Instead, Price argues on appeal that Valvoline's

No. 23-20131

"same decision" argument was an affirmative defense that Valvoline forfeited by failing to raise it below. But Valvoline *did* raise it below—first, as an affirmative defense in its answer to Price's amended complaint, and then again in its motion for summary judgment.[2]

Because, even if Price had presented direct evidence that his race factored into his termination, Valvoline established that Price would have made the same termination decision due to Price's violations of the company's attendance policy, we AFFIRM the district court's decision to grant Valvoline summary judgment on Price's race-discrimination claim. *See Montgomery*, 34 F.3d at 297 ("[T]his Court may affirm a grant of summary judgment on grounds other than those relied upon by the district court when the record contains an adequate and independent basis for the result.").

IV.

Next, we turn to Price's hostile work environment claim. To establish a Title VII hostile work environment violation, Price was required to show that he was subjected to "unwelcome harassment . . . based on race" that "affected a term, condition, or privilege of employment," and that Valvoline "knew or should have known of the harassment in question and failed to take prompt remedial action." *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (quoting *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)). Here, the dispositive question is whether any race-based harassment Price experienced affected the conditions of his employment.

For harassment to alter the conditions of a person's employment, "the conduct complained of must be both objectively and subjectively

_____

[2] We therefore express no view on the question of whether a "same decision" argument is an affirmative defense, as Price contends, or merely part of the burden-shifting framework.

6

offensive." *EEOC v. WC&M Enters.*, 496 F.3d 393, 399 (5th Cir. 2007). "To determine whether the victim's work environment was objectively offensive, courts consider the totality of the circumstances, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance." *Id.* Price has not established an objectively offensive work environment under this test.

First, Price has not shown that the alleged harassment he experienced was frequent. Instead, he identifies two unrelated instances of alleged harassment by different individuals—Langston calling Price a "lazy boy" and Motz saying to Price that "you people always want something for free." As the Supreme Court has explained, such "isolated incidents" "will not amount to discriminatory changes in the terms and conditions of employment" "unless [they are] extremely serious." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quotation marks omitted). But Price has not demonstrated that these comments were "extremely serious" either.

As the district court appropriately recognized, the terms "boy" and "you people" have historically been used in demeaning ways towards Black men. But where, as here, there are only two instances of their use, the terms are insufficiently severe to establish a hostile work environment under our precedent. In *Collier v. Dallas County Hospital District*, for example, we found that "two instances of racial graffiti and being called 'boy'" were "not sufficiently severe or pervasive to alter the conditions of the victim's employment." 827 F. App'x 373, 377–78 (5th Cir. 2020) (quotation marks and citation omitted). Similarly, in *Frazier v. Sabine River Authority Louisiana*, we concluded that coworkers' use of the N-word, the word "Negreet," and a noose gesture "were isolated and not severe or pervasive enough to support a hostile work environment claim." 509 F. App'x 370, 374 (5th Cir. 2013). And other examples abound. *See, e.g.*, *Dailey v. Shintech, Inc.*,

629 F. App'x 638, 640, 644 (5th Cir. 2015) (finding no hostile work environment where a coworker called plaintiff a "black little motherf—r" and threatened to "kick his black a–s"); *Vaughn v. Pool Offshore Co.*, 683 F.2d 922, 924–25 (5th Cir. 1982) (use of the N-word, "coon," and "black boy"). Moreover, these comments were not physically threatening, and Price does not claim that he was humiliated by them, rendering each comment "merely an offensive utterance" insufficient to establish a hostile work environment. *See WC&M Enters.*, 496 F.3d at 399.

As for Price's contention that the district court should have considered Valvoline's "facially neutral actions"—such as nitpicking Price's work, "being yelled at for asking a question," or not being forthright with him concerning his status in the attendance point system—when evaluating the totality of the circumstances for a hostile work environment, we disagree. Price presented no evidence beyond his own speculation and that of Brown that these "facially neutral actions" were racially motivated. And our caselaw is clear that "subjective belief of racial motivation, without more, is not sufficient to show a hostile work environment." *Cavalier v. Clearlake Rehab. Hosp., Inc.*, 306 F. App'x 104, 106–07 (5th Cir. 2009) (declining to consider allegations that supervisor "bragged to others that she would get [the plaintiff] fired, and repeatedly called him a 'doofus' and a 'dunce'" as evidence of race-based harassment supporting a hostile work environment claim).

For these reasons, the district court correctly concluded that Price had failed to establish a hostile work environment claim, and therefore the court's judgment on this claim is also AFFIRMED.

No. 23-20131

JAMES C. HO, *Circuit Judge*, concurring in the judgment:

I agree that Plaintiff's record of absenteeism forecloses his racial discrimination claim, and that we should affirm. I write separately to highlight Plaintiff's contention that the use of the term "diversity" may be evidence of his employer's discriminatory intent.

Specifically, Plaintiff alleges that a plant manager told a supervisor that the company "needed more diversity in the workplace." *Ante*, at 3. Plaintiff took the reference to "diversity" to mean that the company should hire fewer African Americans in the future, due to the racial composition of the existing workforce at the plant.

Cases like this reflect the growing concern that diversity has increasingly become a code word for discrimination.

\* \* \*

Courts have long worried that diversity efforts can lead to discrimination in the workplace. *See*, *e.g.*, *Preston v. Wis. Health Fund*, 397 F.3d 539, 542 (7th Cir. 2005) (noting that "courts take a realistic view of the circumstances" and recognize that business leaders are "under pressure from affirmative action plans" and "diversity" programs to engage in discrimination) (collecting cases); *Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 574 (7th Cir. 2021) (same). The same concerns apply to disparate impact theory as well. *See*, *e.g.*, *Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633, 647–50 (5th Cir. 2021) (Ho, J., concurring in part and concurring in the judgment).

Likewise, courts have warned that diversity has become the "'rationale of convenience' to support racially discriminatory admissions programs" at many colleges and universities. *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 258 (2023)

9

(Thomas, J., concurring) (quoting *Grutter v. Bollinger*, 539 U.S. 306, 393 (2003) (Kennedy, J., dissenting)). Members of the Supreme Court have admonished educational leaders that "[r]acial balancing is not transformed from 'patently unconstitutional' to a compelling state interest simply by relabeling it 'racial diversity.'" *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 732 (2007) (plurality opinion of Roberts, C.J.).

And for good reason. It's no defense that a diversity policy may be well intended—and that it's designed, not to disfavor any particular group, but to favor other groups. That's because favoring one race necessarily means disfavoring those of another race—whether at a company or on a college campus. "When a school offers admission based on a student's race, it denies admission based on a student's race. For every person you 'help' due to race, you necessarily hurt another person due to race. And only by speaking plainly do we ensure fidelity to the Constitution." *Smith v. Sch. Bd. of Concordia Par.*, 906 F.3d 327, 339 (5th Cir. 2018) (Ho, J., concurring).

Nor is it a defense that race is just being used as a crude proxy for intellectual diversity. To begin with, evaluating a person "by ancestry instead of by his or her own merit" reinforces "pernicious stereotype[s]" and "demeans the dignity and worth" of the individual. *Students for Fair Admissions*, 600 U.S. at 220 (quotations omitted). What's worse, this approach is not only insulting but hypocritical, if it turns out the university isn't actually interested in intellectual diversity. It's hard to see how "schools can justify their DEI efforts if their vision of diversity doesn't include diverse viewpoints, if equity doesn't encompass equality for people of faith, and if inclusion involves excluding politically unpopular beliefs." *Hamilton v. Dallas County*, 79 F.4th 494, 508–9 (5th Cir. 2023) (en banc) (Ho, J., concurring). "For schools that tolerate (if not practice) ideological discrimination, . . . diversity is nothing more than a pretext for race." *Id.* at 509.

No. 23-20131

These concerns are not unique to the courts. Scholars and commentators have increasingly come to the same conclusion—that combating discrimination may require dismantling certain policies purportedly devoted to furthering diversity. *See*, *e.g.*, Steven Pinker, *A five-point plan to save Harvard from itself*, Boston Globe, Dec. 11, 2023 (calling for "DEI disempowerment"); Bari Weiss, *How to Really Fix American Higher Education*, The Free Press, Dec. 11, 2023 ("[T]he DEI regime . . . has enforced an illiberal (and antisemitic) worldview at nearly every American university."); Niall Ferguson, *The Treason of the Intellectuals*, The Free Press, Dec. 10, 2023 (examining "racism in the name of diversity" in higher education); Andrew Sullivan, *The Day The Empress' Clothes Fell Off*, The Weekly Dish, Dec. 8, 2023 (calling for the elimination of "systemic race, sex and gender discrimination" and "[e]nd[ing] DEI in its entirety"); John D. Sailer, *University of Washington Violated Non-Discrimination Policy, Internal Report Finds*, Nat'l Ass'n of Scholars, Oct. 31, 2023 (citing an internal report concluding that a university's diversity policy "encourage[d] discriminatory practices").

\* \* \*

In light of the record evidence in this case, the court is correct to affirm. But this won't be the last time someone objects that diversity is being used as a license to discriminate.